May it please the Court. Good morning. My name is Jim Alisha. I'm the attorney on behalf of Centennial Stevedoring Services and Homeport Insurance Company. We would like to point out that the Administrative Law Judge's decision in order, as well as the decision in order of the Benefits Review Board, lacks substantial evidence to show that an aggravation of an underlying pre-existing cervical spine condition worsened attributable to one day of employment with my client, Centennial Stevedoring Services, on February 19, 2001. Specifically, when you look at the evidence in this case, what we do know is that Mr. Coleratore, the claimant in the Longshore Act claim, sustained a specific injury attributable to the employment with International Transportation Services. That injury occurred in August of 1998. After that injury, he had complaints of cervical spine pain. The evidence would show that he eventually underwent an MRI scan. And that MRI scan is very important. It was in September of 1998. And why that's important is that imaging study showed pathology at two levels. It showed pathology at C5-6, also at C6-7. At C5-6, it was a 3 millimeter disc bulge. At C6-7, it was a 7 millimeter disc protrusion and herniation. Thereafter, the evidence would reflect that he underwent cervical spine surgery. And that was in February of 1999. Now, what's important about that surgery is it fused the Dr. Ra, the treating doctor, only fused one level, C6-7. Yet, we know that from the prior MRI scan, the level above that, the adjacent disc, was diseased. So once you fused the one level, logic would dictate that greater stress would be put on the level above as well as the sub-adjacent disc below. So, following the February 1999 surgery, clearly, Mr. Koulartoro, in all of the ensuing medical examinations with Dr. Ra, the treating doctor, as well as Dr. James London, who is the orthopedic surgeon retained on behalf of ITS, those doctors' reports reflect that Mr. Koulartoro was reporting increased complaints of cervical spine pain. And what's interesting is not only did he have cervical spine pain following the first fusion surgery, but he had numbness and tingling in the pinky and ring finger of both hands. The ensuing reports would reflect that those complaints gradually and progressively worsened. And in July of 1999, again, during this time frame, Mr. Koulartoro was on temporary total disability and he had not yet returned to work. What's significant is that during July of 1999, Mr. Koulartoro told Dr. London, the expert for ITS, that he had numbness and tingling in both hands and it was also in his arms. In August of 1999, Mr. Koulartoro now added the exact same complaints, but noted his cervical spine pain was now constant to moderate. He still had the numbness and tingling in his arms and hands, but now he had occipital headaches that were occurring on a daily basis. The evidence would reflect that at this point in time, during the progression of those symptoms, he had still Mr. Koulartoro was then released to return to work on September 6, 1998, and now he's securing employment off of the casualty board. And why this is important is he's now in a light-duty form of employment. He's doing the job duties of a signalman, which require him to look overhead to signal a crane operator 90 feet above. So that job requires a lot of extended movements with the head in an upward extended position as opposed to the downward flexion The evidence would reflect that Mr. Koulartoro continued to seek medical care and treatment with Dr. Andrew Ra, his physician. Now, in October of 1999, notwithstanding the fact that Mr. Koulartoro continued to report ongoing complaints of cervical spine pain, Dr. Ra, the treating physician who did the very first surgery, now said in his report he will require, that is, Mr. Koulartoro will require a revision surgery, presumably to now operate at the level above, which should have been operated at the time of the first surgery, again, because logic would dictate you're now putting greater stress on the disc above. What's extremely important in this case is, in December of 1999, Mr. Koulartoro then underwent a repeat MRI scan at the cervical spine at the request of Dr. Ra. This imaging study now showed that the 3 millimeter disc at C5-6 progressed to a 4 millimeter disc, and not Now, why this information is important is that the administrative law judge, Judge Paul Mates, placed tremendous reliance on this imaging study to show a definitive objective change in the diagnostic study to show that the work further caused an aggravation and a worsening to the underlying cervical spine condition. Judge Mates used that analysis to implicate Centennial with liability for a long-sure act claim under foundation constructors and price, that is, that the employment aggravated, worsened, and accelerated an underlying condition constituting a new injury. The fallacy with that rationale is that that MRI scan, which documents the increased changes, was in December of 1999, prior to the date of my client's alleged injury, which would be February 19, 2001. What's interesting to note is, we know in October of 1999, Dr. Ra, the treating doctor, opined that he required revision surgery. We also know that the evidence shows that there were 3 different requests by Dr. Ra to perform, to obtain authorization from ITS to January of 2001, January 17, 2001, for the very first time, ITS now says we'll authorize that surgery. On that date, the surgery is scheduled for February 23, 2001, and what the evidence shows in this case is, the last employer with whom he worked was Centennial on February 19, 2001. Now, when you look at the recollection of his employment with Centennial, he had no recollection as to how he felt that day. He couldn't even testify that he had an increase in symptoms or a worsening of the cervical spine condition. What we do know is, Mr. Colorado did not report an injury to Centennial. He did not fill out an accident report. He did not tell a doctor that he sustained a work-related injury at Centennial. He didn't tell a doctor that he had any increased symptoms attributable to that employment, and just that he had surgery two days later. Counsel, you made all of these arguments, right, at the hearing, and the ALJ did not rule in your favor. Now, the ALJ relied on the treating physician's testimony, and Dr. London's testimony, and Dr. Thomas' testimony regarding whether or not the claimant sustained an injury that even marginally increased the extent of the injury. Why would we, wasn't the ALJ acting within his discretion in crediting those doctors' testimony and relying on the general testimony of the claimant that each time he worked, it hurt? Yes, Your Honor. However, what the judge did was, he placed great reliance on the testimony of Dr. Andrew Ra. And what Dr. Andrew Ra testified at the time of trial was, the work-related activities on February 19, 2001, while performing the job duties of the signalman, could have aggravated the condition. And those are the key words, could have. Another thing, Judge Paul Mates placed tremendous reliance on the credible testimony of Cosmo Koulouratou at the time of trial. Now, at the time of trial Before we leave that, you're saying that could have is not enough? In the Kalita case, didn't we say that could have is enough to constitute substantial evidence? Well, you have to, there's a presumption under Section 2.2 of the Act. In other words, to show that an injury occurred, something had to go wrong within the human frame. And then with it, that gives a presumption. And then the presumption would then shift over to the employer to rebut that presumption. In this particular case, though, if you look at the totality of the evidence, that testimony by Dr. Ra was nothing more than sheer speculation. And it's further, the testimony of Cosmo Koulouratou at trial. At trial for the first time, July of 2002, his deposition was February 25th, 2002. Mr. Koulouratou comes into the courtroom and now says, my recollection is refreshed. I do recall my employment on February 19th, 2001. And that employment increased and worsened my employment. And that's the second argument that we're going to make. And maybe why there was motivation for there to be a change in the testimony. Well, that's a separate issue, is it not? Certainly. That is your honor. And so we do have a prior fact choosing to believe this man. And once he chooses to believe him, in spite of knowing of the prior contrary or the prior fact, he chooses to believe him. And that's what we get to say about it. Certainly, your honor. Your honor, you get to determine whether or not there was substantial evidence to substantiate the decision in order issued by the administrative law judge. And I fully recognize that you may be thinking it's a factual determination and a credibility determination that's not subject to review at the appellate level. The problem is, and not to get ahead of myself, but if I go into this second argument. Well, I know that's a separate argument. But this one, if the prior fact hears these contradictions and chooses to believe this one, one of which is presumably the truth, or has to be the truth, I guess, where are we? Certainly, your honor. Please recognize that the administrative law judge, to support his finding that an aggravation occurred, pointed to the December 1999 MRI scan of the cervical spine. That predated the employment with Centennial on February 19th, 2001. So when you look at the decision on a whole, it's flawed and I do not believe that it meets substantial evidence. So that other evidence may have motivated the prior fact to believe? Is that what you're saying? That is correct, your honor. In other words, because the rationale was he went, he returned to work in September of 99. And there was employment from September to December. In other words, work that could have aggravated that condition. Very well. I don't want to keep you away from another issue. Certainly. Your honor, maybe this is a good point, but the point that we're making is if you really look at the symptoms that Mr. Koulitora reported immediately following the first surgery, it is unquestioned that all the medical reports chronicle and document increased symptoms, worsening. He had constant headaches, constant neck pain, numbness and tingling in the hands. Any physician would say he's a surgical candidate because he's going to have permanent neurological damage. Your honor, we believe, that is Centennial believes, that there is no substantial evidence to support an aggravation, worsening, or an acceleration with this Court's ruling in Foundation Constructors. The evidence unquestionably establishes that there was nothing more than a natural progression of the underlying condition, which is the second prong in the two-injury test set forth by this Court in Foundation Constructors. With respect to the second argument. Let me, let me just. Certainly. I'm sorry. Go back. No problem at all. Thank you. You make a kind of a broadside in your, in your brief about these ALJs at the, at the, at the, at the, what, San Francisco location or something. And in this case, the claimant really doesn't care how this case turns out. And all of this is an intermural fight that probably is to the benefit of the participants collectively, because what goes around comes around. And someday the shoe will be on the other foot. And so rather than litigate these things to death, we say, you know, kind of tag one guy on this occasion and tag another on another occasion, and so on. Isn't that the practicality of all of this? Your Honor, I believe this Court referred to that as a bright line rule as set forth in the Price decision. But the problem with that is, and I accept my apology, at least as it relates to the insertion in the brief about what has happened with the San Francisco Office of Administrative Law Judges, but what has essentially happened is Foundation Constructors is good law. Gives you the two pronged tests, aggravation or a natural progression. It's either one or the other. Price came in, and now Price is being construed by all of the Administrative Law Judges as last is last. Mere employment alone is enough to constitute an injury, and that's inconsistent with a long line of cases. That's a little more than that. Isn't it? Wasn't there a little more than that in this case? There was evidence that even though it was one day, that the last day of employment marginally increased the injury or marginally aggravated or contributed to the injury. That's correct, but the problem was there was no evidence to support that decision. Doctor's opinions. That could have. And remember the claimant testified that he had no recollection of his activities on February 19th, 2001. And that testimony, Your Honor, that's what this thing is. Here's the problem with your argument on that, is even though he had no specific recollection of his work on that day, he testified that every day he worked, he had to turn his neck a certain number of times, and it hurt. And so even if he didn't recall the specific day that he was working, the evidence is he worked that day, and the evidence is that every time he worked, he had to turn his neck or make his neck go up and down, and that contributed to or aggravated his injury. So why isn't that substantial evidence? Your Honor, we believe when you review the evidence in its totality, it lacks substantial evidence. And I'd like to just get into the second argument, which I think will explain, again, some of the issues that we're raising. The second argument, we're arguing that there was collusion between claimant, Ms. DeCordora-Toro, and International Transportation Services to create or manufacture a last responsible employer claim. Now, what happened was we had the Administrative Law Judge trial, and then we had the decision and order. And the Administrative Law Judge, Judge Mapes, said counsel for International Transportation Services could submit an itemized attorney fee petition documenting the legal work performed. in pursuing their portion of the claim. Now, upon receipt of the itemized attorney fee petition, at this point in time, there were numerous entries. There were 30 entries that were very troubling, and I believe could be characterized as eyebrow-raising. And it was suggesting at least a conscious manipulation of facts to create incentive for Ms. DeCordora-Toro to pursue a last responsible employer claim. Not against ITS, but now against Centennial. When you look at the itemized attorney fee petitions, and specifically, I'd like to direct this Court's attention to the excerpt of records 185 to 187, there's an entry that says, we will give Cosmo Coleritoro a bonus if he gets his pre-injury earnings up to the average weekly wage at the time of the ITS injury. Why is that important? It's important because if his earnings are up, remember, he returned to work in a light-duty capacity. That triggered the wage loss theory under 33 U.S.C. Section 908 C.21 of the Act. If his wages are now back to the pre-injury level, the wage loss theory doesn't get triggered. Number two, there's an entry that says, we will give information, let's submit information to Dr. Ra, the treating doctor, in advance of his deposition. There's also, Your Honor, something else has to be considered. The claimant entered into a settlement with International Transportation Services and Harbor Industrial Services on July 1, 2002. Harbor Industrial Services, who just happened to be the last employer with whom he worked prior to undergoing the surgery in February of 1999, they paid $255,000 to the claimant, payment of attorney fees above and beyond. ITS at that time settled their liability. They paid no money. They paid no money. What they did was they stayed in the litigation to further prosecute a last responsible maritime employer claim against my client, Centennial. The only thing that ITS did was they advanced the cost for the second surgery, which they should have done so in 99, when Dr. Ra, the treating doctor, said he requires a revision surgery, and by all means, August of 2000, October of 2000, December of 2000, when Dr. Ra made three additional requests for the surgery. Remember, that surgery was authorized January 17, 2001. Now the claimant settles with Harbor Industrial, reaches an agreement with ITS. ITS is now a party at the time of trial, and at trial, claimant miraculously recalls his recollection regarding the employment. At trial, he said, I do recall that employment now. My recollection's refreshed, and those activities increased the pain in my neck. Those activities worsened the pain in my neck, and I do recall that employment. During cross-examination, the claimant then recanted that, yeah, he recognized his prior testimony, and he doesn't recall his testimony, but the judge found him credible. So, run that by me again. I'm sorry I don't pick up. How does this benefit the claimant, this so-called conspiracy? Absolutely. Run that by me. And your Honor, I apologize if I was not articulate. No, you were, but I just didn't catch it. It benefits the claimant because July 1st, he received a lump sum payment of $255,000. Now, he has motivation to show a new injury against another maritime employer, the only one who didn't settle, Centennial, and if he shows a new injury, they're on the risk for payment of indemnity benefits, temporary total disability, permanent disability benefits because now there was a surgery, payment of attorney fees, and future medical care and treatment for which he just settled one week prior. So, when you look at the totality of the evidence, when you review the itemized attorney fee petition that was in counsel for ITS's attorney fee petition, the evidentiary record should be reopened. The evidentiary record, the case pursuant to the Second Circuit's Holden and Lake, should be sent back down to the administrative law judge to determine whether or not there was collusion to create a last responsible employer claim. What do those words, we'll pay a premium, suggest? We'll pay a premium in the context you've just described. Certainly. What do they suggest? Those words, the words in the entry, we will pay a premium or you'll get a premium? We will pay a bonus. A bonus. What do they suggest? It suggests that there was already an inducement for something to happen to transfer liability away from one maritime employer to the state who hasn't paid any money to the claimant. Do you suggest or suspect or believe that that bonus is referring to anything more than what you've already described? Well, Your Honor, it says specifically that we'll give a bonus to the claimant if his earnings get back up to the preemptory average wage to avoid a wage loss claim. All right. So we believe that pursuant to the Second Circuit's Holden and the Lake decision that the ALJ order should be vacated, the BRB order should be vacated, the matter should be remanded back to the ALJ for further consideration for a reopening of the evidentiary record to see whether or not there was collusion because the last responsible employer rule was not created to skirt liability. It was actually, again, it was a judicial, no, I don't want to strike that. It was created to allow at least the prompt funding and advancement of indemnity payments, medical benefits, all of those things that are consistent with the workers' compensation scheme in the Longshore Act. Thank you. All right.  You've exceeded your time. Thank you very much. And we'll give you one minute for rebuttal. If it pleases the Court, I'm Eric Dupree. I'm privileged to represent ITS here at this Court of Appeals as well as at both of the lower levels. In view of the Court's questions and my observation today, I'm going to leave my prepared remarks to be very short to allow for discussion with the Court as it feels fit. ITS did the right thing in this case. They saw a last responsible employer case from the very inception. They put not only Centennial and its carrier on notice. They put all of the other waterfront employers on notice. This man is a walking liability bomb. He's going to need medical care. Well, no one gainsays that. The question is why wouldn't it be appropriate with the evidence before the ALJ for there to be an evidentiary hearing concerning the evidence, I would say, that the Petitioner has put forward here that perhaps this was not a legitimate determination of last employer that was made here. What would be the problem with having a short evidentiary hearing to have them explain what they meant by giving the claimant a bonus and submit information and the settlement with ITS and so forth? May I actually read the entry and then respond to the Court's question? The entry may be found in the Excerpts of Records, page 81. It's part of an entry dated March 16 of 2001. The pertinent part says, Willingness to consider a bonus if Cosmo gets earnings back to ITS level. And the short answer is if Cosmo gets his earnings back to the ITS level, it's the old story, a rising tide raises all boats. To the extent that ITS's liability is limited or becomes less because of rising earnings, so does the liability for all of the other employers in this multi-employer case. Is that unusual to offer a bonus to the claimant as an incentive to get his earnings back up? Well, the offer here, and remember we're litigating in two forums, not only the federal forum but the state forum. In the federal forum, the disability is based upon loss of wagering capacity. At the time under the state forum, it was bills on a scheduled rating. It is entirely and often done that we will pay the state's scheduled rating, even though they get their long-short earnings back up to the regular level. What counsel presented to the trial judge below was the answer to my question in there. I ask you, is it unusual to offer a bonus to a claimant for that claimant to get his earnings back up to the level of the employer? Well, there was no actual offer here. It's a willingness to consider. Okay. Is it unusual to be willing to consider the payment of a bonus to a claimant if that claimant raises his income level? In my 30 years of experience, no. Okay. It took a long time getting there to get that answer. I'm sorry, Your Honor. Well, why should – that's one way of looking at it. But why can't you look at it from the point of view that it's being done for purposes of setting up a situation to pass the buck here? I agree that there should be serious concern whether we – whether the trial process has been contaminated. And I think that's a basic question here. What they presented to the trial court was, look, these two attorneys were talking. They were preparing their witnesses together. They were doing those kinds of things. This bonus argument suggesting that the trial testimony is different is something that is really fostered here at the Ninth Circuit level, and it's a change in the reply brief. Although the trial court understood that they were arguing, that we were working in concert, that we were preparing our witnesses and so forth, the trial court, as Lake said, is peculiarly in a wonderful place to observe the motivation of the parties, what they have done. Section 22 is certainly potent in the cases interpreted, allowing for the revisiting of the record. However, it is still the defendant's burden to show that justice would be done under the Act. And in the appellate process, I submit that they need or should have submitted this argument to the trial court, for the trial court to consider. They really didn't present this argument. They're presenting a new argument on trial or at the appellate level. And they're not doomed or precluded from raising this issue. They can still raise this argument. They can still file yet another Section 922 modification and put it squarely before the trial court. Look, I want to depose Dupree. I want to depose Utley. I want to depose her claims adjusters. That is not foreclosed. Well, it's not foreclosed here either. It's before us as well if we want to remand it back for an evidentiary hearing. This is true. So it's not inappropriate as to the procedure that was employed here? Well, it's only inappropriate in that you will be reversing a trial court who didn't really have a chance to rule on the merits of their arguments. You will be giving them a new argument that they're raising at the appellate level rather than one that they well should have raised at the trial court level. It would be a reversal. It would merely be a remand for further proceedings, but it would not be a reversal. And given what would appear to be some suspicious things, especially the fact that the claimant never at the time he was injured reported or knew he was injured and had a wake-up call after these events, which endured to his benefit, that there are a lot of there's a lot of smoke here. I'm not saying there's fire, but there would be something that it would seem to me would indicate that no one would be hurt if there was an evidentiary hearing. Submit the information to the doctor and so forth. You don't see that there's a lot of smoke here that would reasonably be lift up someone's conscience here to say, well, maybe there was something inappropriate. If this court was involved in the proceedings as a trial court was, and I was, my characterization of the defendant's arguments are they are hogwash when you are familiar with all of the litigation. But the court's concern is should we preserve our process somehow and how's the best way to do that? The best way to do that is to ensure that litigants present their arguments first to the trial court and the trial court have fair opportunity to rule on the merits of those arguments. In this case, they presented a they worked together operation to the trial court. They presented that same argument to the intermediate appellate court. If they now want to introduce the newer argument that these entries indicate contamination of the testimony, they're not without a remedy. The remedy is to file a section 22 modification. If they were to do that, unfortunately, we will have to go and participate in that process. But that is a process that I believe they are unfortunately entitled to. And our trial court will have the opportunity, if presented again, to decide whether their profferings are such that under the standards it will do justice under the Act. They would have a higher standard of proof, though, if they did it, so to speak, collaterally than if they did it here and we remanded it back to the district, to the ALJ. No. Respectfully, I disagree. The standard in my mind would be the same. Now, in denying this motion to reopen, the lower court said wouldn't change the result, essentially. Wouldn't change the merits. Tell me what difference it would make to the claimant that this so-called offer of a premium or bonus was in the works. What difference would it make to him? He seeks the same thing in any event, does he not? Or what difference would it make to him? I'm trying to fathom that for the moment. Well, I don't think it makes any difference to a claimant, other than whether he has some immediate funding at a time when he is obviously on very short financial strength. But by ITS paying him, even if it is above what their long-short liability is, it doesn't create any incentive for him to make claims against other employers. And historically, you will know that this — But isn't the offer conditional on his success against the other employer? No. There's no suggestion. There's nothing in the record that says that this is at all in any way connected to any other claim. Except that he gets on the payroll for full pay right away if he goes along with what is acclaimed to be the roost here. No, no. This is a hiring hall gentleman. He shakes up through the hiring hall? Yes. Every day he goes into the hiring hall, and he may be assigned somewhere else. He's not coming back steady for either ITS or Centennial or anybody else. It is the true ruch and roulette who's going to end up with this man on any particular day. I've lost my train of thought. I'm sorry. My thought was, if he goes along with this, he immediately gets his full pay when he's strapped. And then he — in exchange for him coming up with what is alleged to be a false testimony that he suffered an injury on February, whatever it was, 19th, when, in effect, he just — in effect, had just the continuation of a longstanding problem. There's no allegation by Cosmo that he suffered a specific injury on his last day with — I know. No, the question here is, what's the upside for him to go along with this? And I'm merely saying that I think your friend across the aisle has said the upside is that, yeah, he gets back on the payroll for the full — for full wages. He doesn't have to sit out partial, temporary, or whatever they call it. Well, no. The evidence here is, at the time of this discussion, he is barely a month post-surgery. And the question is, is he going to go back to the hiring hall and trying to get employment or not? If he does go back to the — obviously, a claimant who has been operated on four times may not go back to work. And it may be very difficult for any of us to prove that someone at his age with that many surgeries really should be back at work. But if he does go back to work, ITS was willing to pay him his stateside scheduled disability rating without fuss. There was no question he had a surgery. There's no question he's going to have a big stateside rating. There was no money ever paid. There's no evidence that there was ever any money paid. Your position is there is no upside to him to go along with a — this type of fraud or whatever you want to call it, collusion. There's no upside for him. He gets the same dollars, as far as I can remember, whether he gets it from ITS or he gets it from Homeport. But that's the point. Did he get a lump sum payment? ITS's payments to this gentleman, and the record is uncontroverted on it, is limited to we paid for his medical care, as required by the law. We paid for seven months of temporary disability at the statutory rate. At trial, everyone agreed that those payments were reasonable and necessary, given the circumstances of the case. The big settlement was funded by yet another employer, Harbor Industrial Services. If anyone has a reason, the $275,000 payment totally overshadows our payment of seven months of temporary disability payments. There's no evidence here that there was any payments beyond the statutory mandated minimal payment for seven months to Cosmo Corotel. If you believe the two lower court decisions intact, you will foster these policy arguments. A, employers in these cases should be encouraged to voluntarily provide benefits. B, parties should be encouraged to settle cases. C, litigants should present their arguments to the trial courts, not come up with new arguments at the court of appeals. If you, frankly, remand this case, or other than uphold these cases, you are going to send a very chilling wind to any employer in these multi-party cases, who would A, make any sort of offer to the other side, B, enter into any sort of settlement, and certainly C, not provide any medical benefits when your liability is not clearly established. The overwhelming purposes of this act are supported by ITS's actions and conduct. The mudslinging by Centennial is nothing more than an effort to get a second bite at the apple. If they're entitled to the second bite, they still have that right, the statutes, the regulations provide for it, and if they decide to come back, ITS will be there to litigate this case on the merits, however it weighs out in that further proceeding. But here, they just argued at the trial level, my working with another counsel, tainted the evidence, that was a summary of their arguments. That's what the trial court ruled on, that was the evidence that they painted at the benefits review board, that's what the benefits review board ruled on. But I see the court perhaps shaking its head, that that statement is not valid. No, I'm just visualizing, it's not novel for litigants to team up with each other against a third litigant, or whatever the case is, and that, I take it, is all that was presented to the lower court, was the fact that parties are cooperating with each other against somebody that they want to see tagged. Somebody else they want to see tagged. The record is interesting on how their challenge was presented to the trial court, and unfortunately only one of their items is actually in the excerpt of records. They never filed a formal section 922 request for modification. The document from which we arrive here is, I believe, excerpt number 6. Which was construed as a motion for reconsideration, right? But if you actually look at the document, what did the trial court have? I'm sorry, it appears to be excerpt of the record number 9, pages 167 to 178. What's that, 167? That is the pleading which ultimately brings us here to this court. It is what the Benefits Review Board decided to treat as a motion for reconsideration. There they basically asked the trial judge to take judicial notice of my billing records, which the trial court already has, and they asked the trial court to personally review it. Well, counsel, 167 is the motion that had, this is just the declaration of the attorney, right? 167 of the excerpt of the record? Supplemental motion of Centennial Services submitting declaration of Eric Gator Pree. That is their moving paper. That was their motion to abandon their appeal and remand, but they didn't ask for a formal modification process. I understand. Okay. The modification process is controlled by Section 22 of the Act, and the counterpart rules and regulations are 20 CFR 702.373. Okay. You're saying that they went about it in a roundabout way rather than directly through the rules that you think apply, right? Yes. And the importance is really what chance did they give the trial court? And you're sitting here reviewing the actions of the trial court, and the actions of the trial court must be viewed on the record that it had before it. Well, we recognize it was before the trial judge. We recognize that. I'm sorry. We understand your argument. Okay. Okay. All right. Thank you, counsel. Okay. Thank you. Okay. We'll give one minute for rebuttal. I think we understand the party's position. Quick question. Why did you bring it up before the trial judge? I'm sorry. Yes. I'm sorry. Is that a question for me? Yes. Why did I not bring it up before the trial judge? Your Honor, that's the whole point. All of this information came via the Mr. Dupree's itemized attorney fee petition. Post trial? Post trial, post decision and order. So we didn't have it. Then when we reviewed it – by the way, we did file the motion for remand. We don't have to file a section 22 modification. The motion for remand to reopen the record was based on new information that was not available to the party. Could that have been filed before the trial judge instead of – No, because the trial judge had no jurisdiction. I had already issued an appeal of the decision in order to the Benefits Review Board. So now jurisdiction was with the Benefits Review Board. But, Your Honor, if I may, there's one point that I just want to briefly get in. I have 20 seconds. Counsel for ITS for the first time now says, that bonus language, well, there was state liability, concurrent claim. We had liability there. Do you know, I'm unaware of them making any payments whatsoever to offset permanent disability liability with respect to a concurrent claim. David Utley Esquire never files concurrent litigation, never files concurrent litigation. There was no payment of PD. There was an agreement collusion because it benefited the lawyers, the claimant's lawyer, by increased attorney fees, get multiple employers involved, many depositions. His attorney fee goes up. Mr. Dupree's attorney fee goes up. So those are collateral issues that definitely exist. But Mr. Dupree further argues before this Court that the whole purpose is to give an injured worker prompt benefits. This is a collateral return to work in a light-duty capacity. Temporary partial disability liability was due and owing then. And then once his condition was P&S in October, permanent disability liability was due. And they never paid those benefits. And yet he appears before this Court and tries to explain away collusion. Thank you. All right. Thank you, Counsel. Thank you to both Counsel. The case just argued is submitted for a decision by the Court, and this Court is adjourned.
judges: Cowan, Leavy, Rawlinson